## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

THOMAS G. VENTRUDO,

                Plaintiff,

vs.                                    Case No.   3:13-cv-862-J-34MCR

UNITED STATES OF AMERICA,

                Defendant.

_____

ERNEST EUGENE BOLES,

                Plaintiff,

vs.                                    Case No.   3:13-cv-1248-J-34MCR

UNITED STATES OF AMERICA, et al.,

                Defendants.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Thomas Ventrudo and Ernest Boles were passengers in a van driven by John LaLonde on February 21, 2012.   On that date, while traveling east on State Road 100 in Putnam County, Florida, the van collided with a vehicle driven by Joseph Price.   As a result of the collision both Mr. Ventrudo and Mr. Boles filed suit against the United States seeking compensation under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (FTCA). See Ventrudo v. United States of America, Case No. 3:13-cv-862-J-34MCR (Ventrudo Docket); Boles v. United States of America, Case No. 3:13-cv-1248-J-34MCR (Boles Docket).   Although Mr. Ventrudo and Mr. Boles filed suit separately, at the request of the parties, the Court consolidated the cases for the purposes of resolving the common issues of liability.   See Minute Entry dated August 10, 2015 (Ventrudo Docket, Dkt. No. 56).

The United States has waived sovereign immunity in limited circumstances for claims for money damages against the United States for injury, death, or loss of property caused by the negligent or wrongful act or omission of a federal employee while acting within the scope of his employment. <u>See</u> 28 U.S.C. § 1346(b)(1). The parties have stipulated that on February 21, 2012, John LaLonde (the Court will refer to him either as Mr. LaLonde or as the "VA Driver") was employed by the Department of Veteran Affairs (the VA) as a without compensation federal employee/volunteer driver for the North Florida/South Georgia Veterans Health System in Gainesville, Florida. The VA Driver's job responsibilities included transporting patients, specifically veterans, from the St. Augustine, Florida VA Outpatient Clinic to the VA Medical Center in Gainesville, Florida, and back again. As such, the Court deems the VA Driver to be a federal employee for purposes of the FTCA.

This Court has subject matter jurisdiction to hear properly filed FTCA claims arising in the Middle District of Florida. The accident at issue is alleged to have occurred within the Jacksonville Division of the Middle District of Florida. Prior to filing suit, Mr. Ventrudo and Mr. Boles each submitted a timely Standard Form 95 giving the United States notice of their claims. <u>See</u> Joint Supplemental Pretrial Statement filed December 23, 2015 (Ventrudo Docket, Dkt. No. 69) at 11. The United States denied the claims. Having exhausted their administrative remedies, Mr. Ventrudo and Mr. Boles filed the instant action over which the Court finds that it has subject matter jurisdiction.

Pursuant to the FTCA, the United States can be held liable in tort in the same manner and only to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. In considering claims brought under the FTCA, the Court applies the substantive law of the place where the claim arose. <u>See</u> 28 U.S.C. § 2674. Thus, the

substantive law of the State of Florida is applicable in this case.

In the State of Florida, a plaintiff bears the burden of proving all four elements of negligence by the preponderance of the evidence.   See Jefferies v. Amery Leasing, Inc., 698 So.2d 368, 370-71 (Fla. 5th DCA 1997).   To prevail on his claim of negligence, each Plaintiff must establish the following:

> 1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
> 2. A failure on the [defendant's] part to conform to the standard required: a breach of the duty . . . .
> 3.   A reasonably close causal connection between the conduct and the resulting injury.   This is what is commonly known as 'legal cause,' or 'proximate cause,' and which includes the notion of cause in fact.
> 4. Actual loss or damage . . . .

See Curd v. Mosaic Fertilizer, LLC, 39 So.3d 1216, 1227 (Fla. 2010) (quoting Clay Elec. Co-op., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla. 2003)).

Notably, in a negligence action, Florida law requires a court to "enter judgment against each party liable on the basis of such party's percentage of fault …."   Fla. Stat. § 768.81(3).   "The only means of determining a party's percentage of fault is to compare that party's percentage to all of the other entities who contributed to the accident, regardless of whether they have been or could have been joined as defendants."   Fabre v. Marin, 623 So.2d 1182, 1185 (Fla. 1993) (receded from with regards to noneconomic damages by Wells v. Tallahassee Memorial Regional Med. Ctr., Inc., 659 So.2d 249 (Fla. 1995)).   In order to require consideration of the negligence of non-parties, or "Fabre defendants," the named defendant must assert a Fabre defendant's liability as an affirmative defense.   Nash v. Wells Fargo Guard Servs., Inc., 678 So.2d 1262, 1264 (Fla. 1996).   In its Answer as to each Plaintiff's Complaint, the United States asserted that

"Joseph Price, Plaintiff and/or a third party were guilty of negligence, which negligence proximately caused or contributed to the damages" in this case.   Answer and Affirmative Defenses, dated January 6, 2014, at 5–6 (Ventrudo Docket, Dkt. No. 11); Answer and Affirmative Defenses, dated December 16, 2013, at 4 (Boles Docket, Dkt. No. 5).   Next, to require an apportionment of liability to a non-party such as Mr. Price, a defendant must introduce evidence that such party was negligent and that the party's negligence was a proximate cause of the injury.   See Nash, 678 So.2d at 1265 ("In addition to the pleading requirement, the defendant has the burden of presenting at trial evidence that the nonparty's fault contributed to the accident in order to include the nonparty's name on the jury verdict."); see also Mosca v. Middleton, 342 So.2d 986, 987 (Fla. 3d DCA 1977) ("A jury may find that the defendant's negligence was the sole proximate cause of the accident. Even if the plaintiff was negligent, his negligence may not have contributed to the proximate cause of the accident.").   At trial, neither party introduced evidence of negligence on the part of either Mr. Ventrudo or Mr. Boles or any other party.   Thus, here, the Court must determine whether Mr. Price was negligent and whether any such negligence was a proximate cause of the accident before considering his relative fault.

Several Florida traffic laws are relevant to the Court's consideration of the claims in these actions.   While the Court will discuss them here, the Court acknowledges fully that a violation of a traffic statute does not create strict liability, nor is such a violation proof of negligence, it is only evidence of a negligent act.   See deJesus v. Seaboard Coast Line R.R. Co., 281 So.2d 198, 201 (Fla. 1973) ("Proof of violation of a traffic ordinance is prima facie evidence only of 'negligence'; proximate cause and other elements of actionable negligence must be proven independently.").

Florida Statute section 316.183 governs "Unlawful speed". In subsection (1) it states:

> No person shall drive a vehicle on a highway <u>at a speed greater than is reasonable and prudent</u> under the conditions and having regard to the actual and potential hazards then existing. In every event, <u>speed shall be controlled as may be necessary</u> to avoid colliding with any person, vehicle, or other conveyance or object on or entering the highway in compliance with legal requirements and the duty of all persons to use due care.

<u>See</u> Fla. Stat. § 316.183(1) (emphasis added).   Also, under Florida law, a driver has a duty pursuant to Florida Statute section 316.155 to use a turn signal to indicate an intention to turn or to pass the vehicle(s) in front of the driver.   Fla. Stat. § 316.155 (stating that a turn signal "shall be used to indicate an intention to turn, to overtake, or to pass a vehicle").

A driver initiating a turn into another lane of traffic has a duty to ensure that no car is attempting to pass in that lane before starting to turn.   Specifically, section 316.085(2) states:

> No vehicle shall be driven from a direct course in any lane on any highway until the driver has determined that the vehicle is not being approached or passed by any other vehicle in the lane or on the side to which the driver desires to move and that the move can be completely made with safety and without interfering with the safe operation of any vehicle approaching from the same direction.

<u>See</u> Fla. Stat. § 316.085(2).   And a driver wishing to make a turn has a statutory duty to yield the right-of-way to any vehicle attempting to lawfully pass that vehicle.   <u>See</u> Fla. Stat. § 316.122 (a driver intending to turn left must yield the right of way to any vehicle lawfully passing on the left of the turning vehicle "which is . . . so close thereto as to constitute an immediate hazard").

Notably, all drivers have a "duty to drive carefully and avoid hitting other drivers." <u>See</u> <u>Wallace v. Nat'l Fisheries, Inc.</u>, 768 So. 2d 17, 19 (Fla. 3d Dist. Ct. App. 2000).

Indeed, the Florida Supreme Court has instructed that:

> The driver of an automobile—a 'dangerous instrumentality'—is charged with the responsibility of having his vehicle under control at all times, commensurate with the circumstances and the locale, and to maintain a sharp and attentive lookout in order to keep himself prepared to meet the exigencies of an emergency within reason and consistent with reasonable care and caution.

See Bellere v. Madsen, 114 So. 2d 619, 621 (Fla. 1959).   Further, under Florida law, a motor vehicle operator is charged with operating the vehicle "in a careful and prudent manner, having regard for . . . traffic, and all other attendant circumstances, so as not to endanger the life, limb, or property or any person."   Fla. Stat. § 316.1925(1).   Florida Statute section 316.1925(1) states that a "[f]ailure to drive in such [a] manner shall constitute careless driving and a violation of this section."   Id.

In their respective Complaints, each Plaintiff alleges that Mr. LaLonde, the VA Driver, negligently operated the VA Van causing it to collide with Mr. Price's vehicle and legally causing certain injuries to each Mr. Ventrudo and Mr. Boles.   The United States denies negligence and liability on all claims, and contends that Mr. Price's negligence was the sole cause of the collision and any resulting injuries or damages.   Thus, the issues in this case are whether any driver negligently caused the collision and whether the collision can be considered a legal cause of any injuries suffered by the Plaintiffs.

At the request of the parties, the Court bifurcated the trial, hearing evidence on the question of liability only, and leaving the issue of damages for another day.   See Minute Entry (Ventrudo Docket, Dkt. No. 56).   As such, beginning on January 26, 2016, the Court conducted a two day bench trial on the issue of liability.   Five witnesses testified in person: Dr. Brian Pfeifer, John Coffee, Michael Gusse, John LaLonde, and Orion Keifer. Additionally, the Court reviewed evidence introduced by the parties, including photographs

of the roadway, the scene of the accident and the vehicles, as well as the portions of the deposition testimony of Dorothy Peterson and Thomas Ventrudo designated by the parties. Although initially Plaintiffs raised some objection to the Court's consideration of these two depositions, Plaintiffs ultimately stipulated to Mrs. Peterson's unavailability, and the Court determined that the deposition testimony was admissible under Rule 32(a)(8), Federal Rules of Civil Procedure, and Rule 804 (b)(1) of the Federal Rules of Evidence.   At the close of the evidence, the parties opted to present oral closing arguments rather than submit written proposed findings of fact and conclusions of law.

Having reviewed the pleadings, examined the evidence, observed the witnesses, and considered the arguments of counsel, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure.

For the most part, the testimony of the witnesses regarding the circumstances of the accident at issue was consistent.   Thus, in these findings, the Court will summarize the consistent testimony and only address inconsistencies to the extent relevant to the issues to be decided.   Before doing so, the Court notes that each of the witnesses appeared to testify credibly as to his or her recollection of the events.   While their recollections do differ in some important respects, the Court is of the view that those differences in no way suggest intentional deception.   Instead, the differences appear to be the result of the natural memory and the efforts of the witnesses to reconstruct in moment by moment detail a traumatic event that occurred in only 4 seconds some 4 years earlier.   See Eleventh Circuit Pattern Jury Instr. – Civil – Basic Instruction 3.5.1 (2013 ed.) ("But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it.   People naturally tend to forget some things or remember them inaccurately.")

The accident at issue in these actions involved four vehicles.   The 2007 Ford Econoline van driven by the VA Driver, the Chrysler Town and Country van driven by Mrs. Peterson, which was referred to during a significant part of the trial as a Honda Odyssey, the Ford Escape driven by Mr. Gusse, and the Lincoln Town Car driven by Mr. Price. These vehicles were described in various, and sometimes inconsistent terms during the trial.   For purposes of its findings, the Court will refer to the 2007 Ford Econoline driven by the VA Driver as the "VA Van," the Chrysler Town & Country driven by Mrs. Peterson as the "Chrysler Van," the Ford Escape driven by Mr. Gusse as the "Ford" and the Lincoln Town Car driven by Mr. Price as the "Lincoln."

The Court has previously determined, in accordance with the stipulation of the parties, that at the time of the collision on February 21, 2012, the VA Driver was a without compensation federal employee acting within the course and scope of his employment.

Mr. LaLonde, the VA Driver, is a veteran of the U.S. Naval Reserve who at the time of trial was 77 years old.   Although retired, in 2012, the VA Driver was volunteering as a driver of disabled veterans for the Disabled American Veterans (DAV).   He had been volunteering in that capacity since 2006. He generally drove once a week from the VA Clinic in St. Augustine, Florida to the VA Medical Center in Gainesville, Florida and back, and had done so approximately 45 to 48 weeks per year.   At the time of the accident, the VA Driver held a current Florida Class E driver's license and was wearing eyeglasses as required by his license.

Prior to February 21, 2012, the VA Driver had not been involved in an automobile accident in at least 35 years, and had not received a traffic citation for a moving violation since 2006.   Before beginning his volunteer job with the DAV, he had never been employed as a driver for the VA, and had not received any formal driving training.

However, he did ride with another driver twice before he began to drive by himself.   Id.

On February 21, 2012, the VA Driver began his day at 6:00 a.m. when he picked up passengers from the VA Clinic in St. Augustine, Florida.   Driving the 10 passenger VA Van, he transported the passengers to the VA Medical Center in Gainesville, Florida. Sometime between 12:30 and 12:40 in the afternoon after the passengers had completed their medical appointments, the VA Driver left Gainesville with six passengers: John Coffee who was seated in the passenger seat beside the VA Driver; Thomas Ventrudo seated behind the VA Driver in the second row; Ernest Boles seated in the third row behind Mr. Ventrudo, and Paul Arledge seated in the fourth row behind Mr. Boles.   Also in the van was Gerald Nadolski.   The weather was clear and dry and having left at midday Mr. LaLonde was not hurried in his travel back to St. Augustine.

Although the VA Driver was familiar with two routes of travel between Gainesville and St. Augustine, on February 21, 2012, he opted to travel the route with which he was most familiar which took him from State Road 26 to State Road 100.

As the van traveled on State Road 26, it fell behind a logging truck.   At the intersection of State Road 26 and State Road 100, the VA Driver passed the logging truck. The testimony regarding the circumstances of that passing maneuver is in conflict.

The VA Driver testified that upon realizing that the logging truck, like him, was going to turn right on State Road 100, he decided to pass it.   The VA Driver testified that he did so by making the turn behind the truck and then pulling around the truck once he had cleared the intersection.   The VA Driver recalled no oncoming traffic and denied any car having to leave the roadway to complete the pass safely.

The passenger seated in the front beside the driver, Mr. Coffee, also testified regarding this passing maneuver.   At the time of the trial, Mr. Coffee was retired, having

most recently worked as a mechanic, after having driven a truck for 44 years.   Mr. Coffee estimated that over those 44 years, he had driven some 6 million miles.   Prior to February 21, 2012, he had been driven by this particular VA Driver on one or two prior occasions. Although Mr. Coffee expressed certain opinions regarding the quality of the VA Driver's driving on those occasions, the Court finds them to be irrelevant, and has disregarded them in making its findings.

With regard to the incident with the logging truck, Mr. Coffee recalled that it occurred some 10 to 20 miles before the accident scene.   In Mr. Coffee's view, the VA Driver did not wait for the truck to complete the turn onto State Road 100 before beginning to pass it.   Instead, he made a sudden move to the left while still in the intersection.   Also, Mr. Coffee testified that there was a vehicle approaching in the left hand lane that had to slow and possibly leave the roadway to avoid a collision.

The VA Driver and Mr. Coffee both testified credibly regarding this incident, but their testimony is in conflict.   Having no other evidence regarding the incident, the Court is unable to determine which individual's recollection is most accurate.   More importantly, the Court is of the view that what happened some 20 or so miles before the accident sheds little light on the critical issues of what happened in the accident itself.   Thus, the Court disregards the testimony regarding the logging truck incident altogether.

Shortly before 1:20 in the afternoon, the VA Van and its passengers traveling east on State Road 100 had reached the Palatka, Florida area.   The weather was clear and dry, and visibility was good.   In the area where the accident would occur, State Road 100 is a two way straight level road running east/west with no median.   It is a rural area where driveways are not unusual.   The speed limit is 60 mph and there are no visual impediments.   Approaching the site of the accident, vehicles must travel over a small

bridge which is in a no passing zone.   Passing is permitted shortly after a vehicle crosses the bridge.

Having reached the moments leading up to the accident, the Court will briefly summarize the testimony of the various witnesses and the experts before turning back to making its final factual findings regarding the facts of the accident itself.

### The VA Driver

As he approached the site of the accident, the VA Driver testified that he could see 1 vehicle in front of him, a Chrysler Van.   He could not see around that vehicle.   The VA Driver had been aware of the Chrysler Van for some 50 to 100 yards.   He realized the Chrysler Van was traveling more slowly than he as the distance between the vehicles narrowed, and decided to pass it.

According to his testimony, the VA Driver waited until he crossed the bridge and had entered the passing zone.   Because he was going "pretty fast" when he decided to pass the Chrysler Van, he first took his foot off the accelerator.   Next, he made sure no one was traveling in the westbound lane, and then without activating the left turn signal, the VA Van moved into the westbound lane to pass the Chrysler Van.   Upon passing it, the VA Driver was surprised to see another vehicle ahead of the Chrysler Van causing him to slow somewhat before deciding he could pass that vehicle as well.   Once he got abreast of the second vehicle, the Ford, the VA Driver was "really surprised" to see that there was a third car, a Lincoln, ahead as well.   The VA Driver stated he could not see that car until he was "almost right alongside of him."

When he saw the Lincoln, the VA Driver also saw the left flashing light, which could have been a turn signal or a hazard light, but as soon as he saw it, the Lincoln started turning left entering the westbound lane.   At that point, the VA Driver testified he could

not have returned to the eastbound lane without "really getting on the brakes."   Indeed, he testified that he did not even consider doing so at the time as something else might have happened.   He also testified that he did not even have time to honk his horn.

The VA Driver specifically denied seeing the turn signal until just before the accident and stated that he certainly did not see it before initiating the pass.   Despite this, and despite testifying that he did not even have time to honk, the VA Driver testified that he did not see any signs or obvious place for a vehicle to turn.

The VA Driver testified that once the Lincoln started turning, his only option was to prepare to crash.   Because he had no time to brake, he took his foot off the accelerator, and turned his wheel to the left in the hopes of getting around the Lincoln, but the Lincoln was too far in the lane and the vehicles collided.   Asked whether he believed that he had an opportunity to discontinue the pass after entering the westbound lane, the VA Driver testified that because of his momentum he could not do so.   As such, he did not consider slowing down.

The VA Driver estimated that he was in the westbound lane 3 seconds before the collision.   Notably, the VA Driver testified that if he had known there were 3 cars ahead of him instead of one, he would not have initiated the pass as "that would have been a mistake."   Instead, he explained he "would have slowed down and stayed behind the first car [he] saw."

### Mr. Coffee

Before discussing Mr. Coffee's testimony, for the sake of clarity, the Court notes that for much of Mr. Coffee's testimony counsel inadvertently referred to the left hand lane as the eastbound lane.   That reference in the transcript should be read as referring to the westbound lane of State Road 100.

According to Mr. Coffee, as the VA Van approached the bridge, he could see 3 vehicles ahead, and had been able to see those vehicles for quite some distance, perhaps a mile or a half a mile.   The vehicles were slowing causing the VA Van to "gain on them." As it did, Mr. Coffee recalls the VA Driver saying that the car in front had its left turn signal activated and that he commented that "[T]here's no place out here to turn left."   Mr. Coffee testified that he himself was able to see the turn signal as well.

With regard to when the VA Driver saw the left turn signal, Mr. Coffee testified:

> Well, we wasn't very far from them.   As a matter of fact, we was really rather close, because we was at the point that I was expecting him to start stopping for the cars. . . . And instead of starting to stop for the cars, that's when he said: Well, there's no place to turn left out here.
> And he suddenly moved over into the left lane and floored it.   And then almost simultaneously then the Lincoln started to turn, and we was only a few seconds from the Lincoln at the time that we got into the left lane.

Mr. Coffee also testified that he had no doubt that the VA Driver knew the left turn signal on the Lincoln was activated because he brought it to Mr. Coffee's attention.   At the time he saw the turn signal, although Mr. Coffee did not see a place to turn left, there was indeed such a place.

As they drew closer to the slowing vehicles, Mr. Coffee believed that the VA Driver may have slowed a bit but then he moved suddenly to the left lane and started to pass. Almost simultaneous with the VA Driver's movement into the westbound lane, the Lincoln began its left turn.   By that time, the 3 cars that had been ahead of the VA Van were "real close together."

In Mr. Coffee's view, the VA Van moved into the passing lane almost simultaneous with the Lincoln beginning its turn.   At the speed the VA Van was traveling there was no time to brake. Mr. Coffee noted that was the reason there were no skid marks at the

accident scene. Also, he testified that once the Lincoln started to turn, there was no way for the VA Van to get back in line because the cars were too close together.   He described the cars as either all bunched up or bumper to bumper waiting for the Lincoln to turn.   He also testified that that the VA Van was very close to the slowing vehicles when it whipped into the left lane.

Mr. Coffee testified that he knew the VA Van was going to wreck as soon as it moved to the left lane because he saw the Lincoln starting to turn.   Unable to brake, the VA Driver turned left into a ditch in an attempt to avoid the collision.   His quick thinking averted a far worse collision.   Mr. Coffee believes the van was traveling approximately 55 mph at the time it left the roadway to avoid the collision.

In Mr. Coffee's view, if the driver of the Lincoln had looked back before starting to turn left, he would not have seen the VA Van because the VA Van moved into the westbound lane almost at the same time as the Lincoln began to turn.   For this reason, Mr. Coffee was upset to hear that the driver of the Lincoln had received a citation.   Shortly after the accident, Mr. Coffee called the VA to express his feeling that the driver of the Lincoln had not done anything wrong.

At trial Mr. Coffee testified that before the accident he saw a motorcycle approaching in the westbound lane.   Previously, he had testified that he did not recall a motorcycle but that other witnesses saw it.   Mr. Coffee explained that after hearing the other witnesses he recalled the motorcycle.   However, Mr. Coffee remembered the motorcycle only vaguely and his recollection was inconsistent with his prior testimony. Also neither Mr. Gusse nor any other witness testified to the presence of a motorcycle at this time in the sequence of events.   Thus, the Court declines to credit Mr. Coffee's testimony regarding his personal recollection of the presence of a motorcycle before the

collision.

**Mr. Gusse**

At the time of trial, Michael Gusse had been a manufacturer's sales representative for some 20 years.   In the course of his employment he drove approximately 60,000 miles per year, and had done so for some 20 years.   On February 21, 2012, Mr. Gusse was in Florida on vacation with his wife. At the time of the accident, the two were traveling east on State Road 100 in a Ford Escape in front of the Chrysler Van driven by Dorothy Peterson, and behind a Lincoln driven by Mr. Price.

Mr. Gusse testified that the Lincoln was 100 yards ahead of him with its left turn signal activated, when he, that being Mr. Gusse, started to brake.   Mr. Gusse had been able to observe the turn signal blinking for 30 – 45 seconds before the accident.   As he approached the Lincoln, he slowed almost to a stop, at which point he noticed the VA Van accelerating in his rear view mirror.   Mr. Gusse first noticed the VA Van when it entered the westbound lane to pass. By then, the Lincoln had come to a stop with its brake light on and its turn signal activated.   As a result, Mr. Gusse was slowing to a stop when he looked back to see the van accelerating.

When he saw the VA Van, Mr. Gusse turned to his wife and said, "This doesn't look good."   Mr. Gusse explained that "the Lincoln had started its left hand turn and it looked to me like there was going to be a collision right next to me."   In his view, the VA Van's acceleration and start of the Lincoln's left hand turn were "pretty close to simultaneous."

The VA Van attempted to maneuver around the Lincoln even leaving the road. The Lincoln also attempted to evade an accident by braking hard.   But still the two vehicles collided.

Before the Lincoln started turning left, Mr. Gusse did not see a place for it to turn

but when it began to turn, Mr. Gusse could see the driveway.

Mr. Gusse estimated the speed of the VA Van at time it headed toward the Lincoln to be 40-50 mph.

### Mrs. Peterson

At the time of the accident, Mrs. Peterson lived in Florahome, Florida.   She was very familiar with State Road 100, having travelled that stretch of road once a week for some 37 years.   On February 21, 2012, as she approached the bridge area of State Road 100, Mrs. Peterson recalled being about two car lengths behind the Ford.   She believed she first began to slow when the VA Van came out from behind her to pass. She also testified that she believed the VA Van was in the passing zone when it began to pass. Mrs. Peterson did not recall if the vehicles in front of her were slowing or braking at that time. She also did not recall the VA Van having its left turn signal activated. Mrs. Peterson believed she was traveling approximately 55 mph and that the VA Van was traveling at about the same speed despite the fact that it was passing her. Mrs. Peterson could not see if the Lincoln had its turn signal activated due to the car in front of her.

Although Mrs. Peterson recalled seeing a motorcycle after the accident she did not recall seeing a motorcycle before hand.

As the VA Van was passing her, Mrs. Peterson was slowing. She saw the VA Van passing her and then immediately saw the Lincoln crossing into the westbound lane. As soon as she saw the Lincoln begin to turn she knew there would be a wreck. The Lincoln was in the road and the VA Van had no place to go.

Mrs. Peterson testified that she was surprised to see the Lincoln start its turn in that location. There are no road signs there. Having travelled that roadway regularly, Mrs. Peterson was not aware of a dirt road in that location.   As a result she thought the Lincoln

was doing a "turnabout" or a U turn.   Nevertheless, she acknowledged that regardless of whether she knew of a road in the location of the accident, the driver of the Lincoln could have known of such a road.

### Mr. Ventrudo

Mr. Ventrudo was seated behind the VA Driver on the trip back to St. Augustine, when "all of a sudden," the VA Driver decided to pass 3 cars. And as he was passing others yelled out "watch out, Jack."   Mr. Ventrudo recalled the Lincoln slowing, and the Ford behind it slowing.   Although he did not see a turn signal, he stated that both the VA Driver's head and the Ford were blocking his view.   Additionally, he testified that he didn't pay much attention until he heard others yell "watch out, Jack."   Then "suddenly, for no reason at all" the Lincoln started to turn left.   Mr. Ventrudo recalled the vehicles ahead of the VA Van all being about a car length apart.

When the passengers yelled, the VA Driver swerved to the shoulder of the road. Immediately prior to the accident, Mr. Ventrudo had not seen a sign saying there was a road where the Lincoln turned.   He saw no oncoming vehicles in the westbound lane. And he heard no conversation between the VA Driver and any other passenger.

### Dr. Pfeifer

Plaintiffs presented the testimony of Dr. Brian Pfeifer.   Dr. Pfeifer is a consulting engineer with BEC Consulting in Tallahassee, Florida. He has bachelor's and master's degrees in mechanical engineering and a Ph.D. in civil engineering. Dr. Pfeifer has conducted between 6 and 8 hundred accident reconstructions over almost twenty years, and has testified in court regarding accident reconstruction some 25 - 35 times. Defendant did not contest Dr. Pfeifer's qualification to express his opinions in this case.

Dr. Pfeifer testified that accident reconstruction uses physics, including vehicle

dynamics, engineering, and math to relate the physical evidence from an accident to the testimonial evidence and recreate what happened.

Dr. Pfeifer was contacted shortly after the accident by Mr. Ventrudo's counsel. Within 4-6 weeks of the accident, he went to the scene of the crash and took measurements and photographs.   He also examined Mr. Price's Lincoln.   Some time later he was permitted to inspect the VA Van, and he, along with defense expert Orion Keifer, downloaded the data from the VA Van's powertrain control module.   Prior to trial, Dr. Pfeifer had reviewed the testimony of some witnesses and the report of Mr. Keifer. Combining the measurements and information obtained from his inspection of the accident scene with the data from the VA Van's powertrain control module, Dr. Pfeifer testified that he was able to determine the speed of the vehicle at specific points in time. Specifically, he determined the percentage of throttle, use of the brakes, and acceleration of the vehicle at those times and formed opinions as to the location of the vehicles and the actions of certain drivers at those times.

Dr. Pfeifer provided the following opinions:

- 20 seconds before impact the VA Van was traveling 50 mph.

- 4 seconds before impact, the VA Van had slowed to 38 mph, well below the speed limit.

- 3.4 seconds before impact, the VA Van was still traveling in the eastbound lane at approximately 39 mph when the driver tapped the brakes.

- 3 seconds before impact the VA Van began moving into the westbound lane.   At this point the VA Driver could see that he would be passing three vehicles.   He could also see that the left turn signal of the Lincoln was activated.   The VA Van was 232 feet from the point of impact.

- 2.4 seconds before impact, the front end of the VA Van was fully in the westbound lane and the rear of the Lincoln was in view.    The Lincoln had not yet begun to turn.

- 2 seconds before impact, the VA Van was accelerating at 100% throttle, and the VA Driver had full view of all three cars and the left turn signal of the Lincoln.    Because of the size and sluggish nature of the vehicle, despite being at 100% throttle, its rate of acceleration here would only increase 1 to 2 mph.    But, the percentage of throttle would be indicative of the driver's intent.

- 1.6 seconds before impact, when the Lincoln would have been starting its turn, the VA Van was traveling at 41 mph, at full throttle, and was 129 feet from the point of impact.

- 1 second before impact, the Lincoln was crossing the center line and the VA Van was still at full throttle.    But the driver was beginning the evasive steering maneuver.

- .8 seconds before impact, the VA Driver had taken his foot of the accelerator and begun turning left.    At this time the VA Van was at 69.5% of throttle.

- Because a person can effect steering input faster than braking, the VA Driver was able to start turning before he could brake.    But he was able to brake right at the point of impact.

- At the point of impact the VA Van had slowed to 34 mph.

- In the seconds leading up to the collision, the drivers of the Ford and the Chrysler Van would have been slowing to the speed of the Lincoln which Dr. Pfeifer opined was going 10-15 mph or slower in making his turn.

- Prior to the collision, the VA Van would have been established in the westbound lane for 2 seconds.    By this time, it would have been visible to the driver of the Lincoln.

- Commonly accepted perception / reaction time is 1.5 seconds - .75 seconds to perceive and another .75 seconds to react.

- The VA Driver would have needed to see 2 flashes of the Lincoln's left rear light to recognize it as a left turn signal.

- Dr. Pfeifer measured the passing lane at the scene of the accident which began 150 feet before the point of impact.

- Even if the VA Driver could not see that he was following multiple vehicles before starting to pass, as soon as he began his movement into the westbound lane the VA Driver could see that there were multiple vehicles in front of him and had the opportunity to avoid collision simply by taking his foot off the accelerator, slowing, and merging back into traffic. Similarly, if Mr. Price had not turned, the accident would not have happened.

- Even if the VA Driver did not see the Lincoln's turn signal, he knew the vehicles ahead were slowing.

When inspecting the crash site, Dr. Pfeifer was able to see the opening into which Mr. Price was turning.

**Mr. Keifer**

The United States presented the testimony of Mr. Orion Keifer.  Mr. Keifer works as an engineer and accident reconstructionist at Applications Engineering Group in Atlantic Beach, Florida. He has an undergraduate degree and a master's degree in mechanical engineering from the U.S. Naval Academy and a master's degree in biomechanical trauma from Lynn University.  Over his career, Mr. Keifer has performed over one thousand accident reconstructions, has published several articles in accident reconstruction, and has testified in federal court regarding the field of engineering.  Neither Plaintiff challenged Mr. Keifer's qualifications to express opinions in this case.

After being retained by defense counsel, Mr. Keifer inspected the accident scene and reviewed information regarding the vehicles involved, including photographs and an

exemplar of the Lincoln.   He also obtained the data from the VA Van's powertrain control module and reviewed the depositions of Trooper Vega, Corporal Wood, Mr. Price, the VA Driver, Mr. Coffee, Mrs. Peterson and Mr. Ventrudo.   Prior to trial, Mr Keifer also reviewed the file, expert report, and deposition of Dr. Pfeifer.

Based on his review, Mr. Keifer testified to the following opinions:

- The VA Driver was in the passing zone at the time he moved into the westbound lane to initiate the pass. This opinion is based largely on the VA Driver's testimony that he was in the passing lane and the consistent testimony of other witnesses.

- The VA Driver began intruding into the westbound lane 2.6 seconds before impact. In his initial calculations, Mr. Keifer believed the passing zone to begin 176 feet before the point of impact.   Assuming that the VA Driver moved into the westbound lane only when he could do so lawfully, Mr. Keifer initially calculated that he entered the passing lane 3 seconds before impact.   However, Mr. Keifer later realized that the passing zone was 26 feet shorter on February 12, 2012, than it was on the day the image he used to measure it was taken. As such, once again assuming that the VA Driver entered the passing zone lawfully when he began to pass, Mr. Keifer opined that he began to enter the westbound lane 2.6 seconds before impact.

- If the VA Driver started to pass 3 seconds before then he would have started across the center lane 26 feet before the passing zone began.

- As the VA Van approached, the Chrysler Van was traveling 20 mph in a 60 mph zone.

- 2 seconds before impact, 30% of the VA Van was in westbound lane.

- 1.7 seconds before impact, the VA Van was passing the Chrysler Van.

- When the VA Van was passing the slowing vehicles, it was traveling 20-25 mph faster than those vehicles.

- Moving at a rate of 40 mph, a vehicle travels 58 or so feet per second.

- Moving at 39 mph, a vehicle travels 57 feet per second.

- To recognize the Lincoln's light as being a turn signal, the VA Driver would have needed to see at least 2 cycles of the light flashing which would take 1.4 seconds given that the Lincoln's signal cycle was .7 seconds.

- Although typical unalerted reaction time is 1.5 seconds, for a person like the VA Driver who was passing at least one other vehicle, one would expect a shortened alerted response time of 1 second.

- The flashing light on the Lincoln was not what alerted the VA Driver to the impending danger, it was the Lincoln starting to turn, and the VA Driver reacted quickly to that.

- Like Dr. Pfeifer, Mr. Keifer opined that when the VA Driver commenced to pass, he "would have seen . . . the left blinking light of the Lincoln," and when the Lincoln started turning he observed that and responded quickly.   Prior to that point, in Mr. Keifer's opinion, the VA Driver would have had no opportunity to see the turn signal because of the size of the Chrysler Van.

- Mr. Keifer further opined that it was unlikely that Mr. Coffee could have seen the Lincoln's turn signal from the passenger seat before the pass because the Chrysler Van was wider and taller than the Lincoln.

- Also, like Dr. Pfeifer, Mr Keifer opined that the Lincoln started turning 1 second before impact, and that once the Lincoln started to turn, there was no way to avoid the collision.   All the VA Driver could do was swerve.

- The VA Driver could not get back behind the Chrysler Van, because at the speed the VA Van was traveling, it would take 74 feet, braking hard, for it to slow to the speed of the other cars.   The VA Driver did not have the distance.

- Because the VA Van was completely in the westbound lane before the Lincoln started to turn into the westbound lane, in Mr. Keifer's opinion, the action of the Lincoln caused the accident.   In that regard, Mr. Keifer opined that the VA Driver would have had to have been clairvoyant to have avoided the accident.

- Specifically, he opined:

> Had he been clairvoyant and knew that Mr. Price was going to turn, potentially slamming on his brakes he would have been able to stop before impact, but there was no indication of anything awry until Mr. Price started to go into the westbound lane.

- He also opined it was reasonable for the VA Van to initiate the pass.   While he acknowledged that it was not a gradual lane change, Mr. Keifer declined to characterize it as aggressive.

- Having inspected the area of the accident, Mr. Keifer testified that there are no physical indications of a roadway at the site of the accident. Nevertheless he did not dispute that a roadway or driveway existed or that it could be seen once one was adjacent to it.

- Recognizing the Lincoln driver's testimony that he checked his mirror before turning and the lane was clear, Mr. Keifer testified that if he checked 3 seconds before impact, by his calculations the lane would have been clear.

- Under Florida law a passing vehicle is required to use a signal.

- The VA Van and the Lincoln did not enter the westbound lane simultaneously.

- Once the VA Van entered the roadway, the collision was unavoidable because the

VA Van did not have the time and distance to avoid it.

"[U]nless [the VA Driver] had a crystal ball," the accident was unavoidable.

Having summarized the conflicting testimony, the Court now returns to its factual findings and conclusions of law.

To the extent the VA Driver testified that he could not see the Lincoln or its turn signal until he was "almost alongside" either it or the Ford, the Court rejects that testimony. Preliminarily, the Court accepts Mr. Gusse's testimony that the Lincoln had its turn signal activated for some 30-45 seconds before the accident.   Regardless of whether the VA Driver saw all three vehicles or the Lincoln's turn signal before initiating the pass, based on the testimony of both Dr. Pfeifer and Mr. Kiefer, he certainly could have seen all three vehicles and the Lincoln's turn signal as soon as he started into the westbound lane.   At that point, the VA Driver had the opportunity to avoid the collision by slowing and merging back into the eastbound lane.

Notably, the VA Driver's testimony that he believed there was no place for the Lincoln to turn supports the conclusion that he became aware of the Lincoln's turn signal earlier and had time to consider whether it was going to turn before the Lincoln actually began to turn.   First, the VA Driver acknowledged seeing a "blinking" light but explained that he did not know if it was a turn signal or a hazard.   To recognize the rear light as a blinking light, the VA Driver had to have been able to observe it for at least 1.4 seconds. Next, in order to reach the conclusion that there was no place for the Lincoln to turn, the VA Driver would have had to have enough time after seeing the turn signal to look or question where the Lincoln was intending to turn.   But, according to the VA Driver, because he did not see the Lincoln or its turn signal until he was just abreast of it, and when the Lincoln was starting to turn, he would not have had time at that point to look for

a roadway or even consider the Lincoln's intentions.   Indeed, as the VA Driver acknowledged, he did not have time to brake or honk his horn.   As such, the Court concludes that the VA Driver saw the Lincoln's turn signal earlier than when the VA Van was abreast of it.   Although he may not have seen it before initiating the pass, when he was beginning to move into the westbound lane, the VA Driver saw the left turn signal of the Lincoln, and it was, at the latest, at this point that he brought it to the attention of Mr. Coffee, commenting that there was no place for the car to turn left.   Although Mr. Coffee believed he saw the turn signal much earlier, he also testified that the VA Driver brought the turn signal to his attention.   The Court credits this latter testimony.

The evidence is also in conflict as to whether the VA Driver was in the passing zone when he initiated the passing maneuver.   Although the VA Driver testified that he was in the passing zone, both Mr. Ventrudo and Mrs. Peterson agreed, and Mr. Kiefer opined that he was, the Court finds by the preponderance of the evidence that he was not.   First, Mr. Ventrudo and Mrs. Peterson both acknowledged that they were not really paying attention to the VA Van until after it started to pass. Thus, the Court affords their recollection as to where it was when it initiated the pass little weight.   Indeed, the Court notes that Mr. Ventrudo, who by his own admission was not paying attention to the roadway ahead of him, believed the Lincoln to have turned left unexpectedly or suddenly despite undisputed testimony that it had been slowing for some distance, had its turn signal activated for between 30 and 45 seconds, turned slowly, and was applying its brakes.

Next, with regard to the testimony of the expert witnesses, the Court finds the testimony of Dr. Pfeifer as a whole more persuasive and consistent with the remaining witness testimony and evidence.   Dr. Pfeifer appeared to the Court to be more

knowledgeable and his opinions relied significantly on objective data from the VA Van powertrain control module.   Mr. Keifer, on the other hand, relied heavily on the recollection of the witnesses and at times expressed opinions that appeared to disregard certain facts or unfavorable testimony.   Notably, Mr. Keifer changed his estimate of when the VA Van entered the westbound lane from 3 seconds before impact to 2.6 seconds before impact when he realized the passing zone was shorter than originally thought. This change was made solely based on the testimony that the VA Driver passed lawfully. But that testimony is not fully supported by the objective evidence taken from the powertrain control module of the VA Van or the remaining evidence, and the Court rejects Mr. Keifer's opinion on this issue.

The objective evidence is in large part consistent with Mr. Coffee and Mr. Gusse's description of the seconds prior to the accident.   For example, Mr. Coffee testified that as they approached the slowing vehicles, the VA Driver slowed a bit before suddenly beginning to pass. The powertrain control module data shows that at 3.4 seconds before impact the VA Driver traveling at 39 mph tapped his brakes. Then at 3 seconds before impact, Dr. Pfeifer opines the VA Driver began to move into the westbound lane.   The VA Driver himself testified that he was in the passing zone no more than 3 seconds before impact.   The Court concludes that the VA Driver began to initiate the pass 3 seconds before impact.   At 3 seconds before impact, by Mr. Kiefer's calculation, the VA Van was 176 feet from the point of impact and by Dr. Pfeifer's calculation the VA Van is even further away.   In either case, the VA Van had not yet reached the passing zone when it begins to pass.

Although the Court resolves this factual conflict, the determination of whether the VA Van was in the passing zone is not determinative of whether the VA Driver breached his duty of care.   As noted, after learning that the passing zone actually started only 150 feet before the point of impact, Mr. Keifer changed his opinion as to when the VA Driver actually began to pass from 3 seconds before impact to 2.6 seconds before impact.   While this would place the VA Van at the start of the passing zone, it would also mean that the VA Driver started to pass only 2.6 seconds before impact and in that time had moved abruptly to the westbound lane and passed the two other intermediate cars before colliding with the Lincoln.   As the Court will now discuss, such actions would be equally, if not more, aggressive and careless, even if he had reached the passing zone.

Traveling east on State Road 100 in the 24 foot long, 10 passenger VA Van carrying 6 passengers, the VA Driver came upon slowing traffic.   Regardless of whether he saw 1 car ahead of him or more, the Chrysler Van, the car immediately ahead of the VA Van, was going significantly slower than the VA Van.   In this regard, the Court rejects Mrs. Peterson's belief that she was traveling around 55 mph.   That testimony is in conflict with that of the VA Driver, Mr. Gusse, the objective data from the powertrain control module, and both experts.   As it approached the Chrysler Van, the VA Van had slowed from 50 mph to 38 or 39 mph in 16 seconds. The Chrysler Van, following the Ford and the Lincoln which was coming to a stop with its turn signal activated, was going at most 20 mph.   The VA Driver did not know why the Chrysler Van was slowing and could not see what was ahead of it.   Rather than slow to determine the reason for the slowing traffic, the VA Driver, without utilizing a turn signal abruptly began to move into the westbound lane.

The Court flatly rejects the opinion of Mr. Kiefer that the VA Driver would have had to have been clairvoyant or had a crystal ball to know that something ahead of him was awry. Such an opinion ignores undisputed facts.   The VA Driver knew that traffic ahead of him had slowed unexpectedly, that the car ahead was moving significantly slower than he, and that he did not have any idea of what lay ahead because he could not see around the Chrysler Van.   Certainly, the unexpected and unexplained slowing of vehicles ahead would cause a reasonable and prudent driver to question why the vehicle was slowing and wonder if a problem may lay ahead.   In the brief instant that he decided to move to the westbound lane, the VA Driver could not have reasonably determined whether some danger or hazard was causing the Chrysler Van to slow.   Moreover, while the VA Driver may not have believed there was a place to turn left in that area, the VA Driver could not have known that for certain.   Indeed, he was mistaken.

Under Florida law:

> Negligence is the failure to exercise due care under the circumstances.   A person is negligent if he does something that a reasonable and prudent person would not ordinarily have done under the same or similar circumstances.   A person is also negligent if he fails to do that which a reasonable and prudent person would have done under the same or similar circumstances.   So it is that the amount of care which a person is required to exercise depends in a large measure on the extent to which his conduct may involve a risk of harm to others.   As the likelihood that others may be injured increases, the amount of care which should be exercised also increases.

Jacksonville Journal Co. v. Gilreath, 104 So.2d 865, 867 (1958).   Under the circumstances here, the Court finds that a reasonable and prudent driver would slow to determine whether it was safe to pass the slowing vehicle rather than simply maintaining his relatively high rate of speed (when compared to that of the other cars) and attempt to pass the vehicle or vehicles ahead of him at the very first opportunity.   Had the VA Driver

slowed, even briefly, to peer around the Chrysler Van to determine the reason for the slowing traffic, or the number of vehicles ahead of him, he could have observed the line of cars ahead and likely no collision would have occurred.

The Court finds that at the time the VA Driver initiated the pass he had not given himself sufficient time to have the information necessary to make a reasonable and prudent decision to make the passing maneuver.   Indeed, the VA Driver acknowledged that had he known he would be passing 3 vehicles, he would not have done so as it would have been a mistake.   Yet, he began the pass without allowing himself time to determine that was precisely what was ahead of him.

Moreover, the evidence establishes that as he began to pass, the VA Driver should and could have observed that he was passing not 1, or 2 vehicles, but actually 3 vehicles, and also should have had a view of the activated left turn signal of the Lincoln.   Despite this, the VA Driver did not discontinue the pass, he continued forward accelerating in the westbound lane.   From that moment, the collision was unavoidable.

In this regard, the Court also finds that the VA Driver failed to exercise reasonable care by failing to decrease his speed in light of "the conditions and having due regard for the actual and potential hazards" as required by Florida Statute section 316.183(1).   The VA Driver had a duty to operate the vehicle at a speed not greater than reasonably prudent under the circumstances and to avoid colliding with any vehicle legally entering the roadway.   This he did not do.   By continuing to travel at a rate of at least 38 mph and even accelerating beyond that speed despite the vehicle ahead of him going only 20 mph, the VA Driver failed to exercise due regard for actual and potential hazards.   He further created a situation in which, once he moved fully into the westbound lane, he could not safely slow his vehicle enough to return to the eastbound lane.

The VA Van, because of its high rate of speed when compared to that of the other vehicles, could not return to its position behind them.   And because the three vehicles were slowing or stopping in the short distance behind the Lincoln waiting for it to turn, they were 1.) going too slow and 2.) too close together for the 24 foot VA Van to slip in between them.   Last, even hitting the brakes hard, the VA Van did not have the distance at that point to stop before colliding with the Lincoln.

Once the VA Van began to move to the westbound lane, the three vehicles ahead in the eastbound lane were visible to the VA driver as was the turn signal of the Lincoln. At that point, regardless of whether he was in the passing zone, it was neither reasonable nor prudent to continue to move fully into the westbound lane.   A reasonable driver, exercising due regard for the attendant traffic and all other circumstances would not make such an aggressive move.   A sudden lane change may constitute negligence where it puts another in a position of peril.   See Gertler v. Peterson, 116 So.2d 778, 779 (Fla. 3d DCA 1960).   While it would not be negligent if the sudden lane change was precipitated by an emergency situation, see id., here, there was no emergency that prompted the VA Driver to move to the westbound lane.   It was simply a choice.

The Court is mindful that the VA Driver is a veteran, for whose military service the Court is grateful, and who selflessly volunteered his time to drive fellow veterans. Nevertheless, the Court must find that in these few moments, he made an error in judgment.   And that error resulted in a breach of his duty of care which was a legal cause of the collision at issue here.

Turning to the question of apportionment of liability, the United States contends that the Lincoln's failure to yield the right-of-way was the sole proximate cause of the accident.

And, if not the sole cause, a contributing cause of the accident.   Specifically, it contends that if the Lincoln had not turned, the VA Driver could have completed the pass safely. Additionally, the United States points to Florida Statute section 316.085 which requires a driver to assure that he is not being passed before starting a turn.   While it is true that if the Lincoln had not turned left the VA Van could have completed the pass, that fact is not what matters in these cases.   Well before the VA Van took any action at all, the Lincoln was slowing with its turn signal activated for some 30-45 seconds notifying the cars behind him of his intention to turn.   The two vehicles directly behind the Lincoln were appropriately slowing to allow him to complete his turn.   This includes the Chrysler Van. Notably, the driver of the Chrysler Van could not see the turn signal of the Lincoln, yet she too was slowing like the car ahead of her.

Moreover, the evidence reflects that the VA Van was established in the westbound lane for at the most 2 seconds before impact.   The Lincoln started to turn 1 second before impact.   Thus, the driver of the Lincoln in looking back before starting to turn, could not have seen the VA Van.   And if the Lincoln did see the VA Van at the split second that he began to turn, he would not have had enough perception/reaction time to alter the course of the events. Indeed, the physical evidence from the powertrain control module when combined with the consistent testimony of the witnesses reflects that the VA Van's move to the westbound lane was almost simultaneous (within about 11/2 seconds) with the Lincoln beginning to turn.

By Dr. Pfeifer's calculation, the VA Van began to move to the westbound lane 3 seconds before impact and the Lincoln began to turn 1.6 seconds before impact.   Also, while Mr. Kiefer disagrees that both vehicles moved to the westbound lane

"simultaneously," by his calculations the VA Driver began to pass 2.6 seconds before impact and the Lincoln began turning 1 second before impact.   Certainly, that could be described as "almost simultaneous."   The driver of the Lincoln could not have seen and reacted to the VA Van in the 1 or 11/2 seconds that it moved into the westbound lane before the crash.   Indeed, as acknowledged by the United States' own expert, once the VA Van entered the westbound lane, the collision was unavoidable.

Having activated his turn signal, looked in his rear view mirror and given that the traffic behind him was responding appropriately, the Lincoln had no reason not to proceed with his lawful left turn.   The Court identifies no negligence on the part of the driver of the Lincoln.   The actions of the Lincoln were not only not the sole proximate cause of the accident, they were not a legal cause of the accident at all.

Based on the foregoing, the Court concludes that on February 21, 2012, the VA Driver, a federal employee acting within the course and scope of his employment, negligently operated the 2007 Ford Econoline Van carrying Mr. Ventrudo and Mr. Boles and causing it to collide with a Lincoln Continental driven by Mr. Price.   The VA Driver's negligence was the sole legal cause of the collision.

In accordance with the foregoing, the Court determines that Mr. Ventrudo and Mr. Boles have carried their burden of establishing by a preponderance of the evidence the existence of a duty on the part of the United States, the United States' breach of that duty and that the breach was the legal cause of the February 21, 2012 collision between the VA Van and the Lincoln.   As such, partial judgment as to the issue of liability for the collision is due to be entered in favor of each Mr. Ventrudo and Mr. Boles and against the United States.   Nevertheless, because the question of damages remains to be determined in each case, the Court declines to enter partial judgments at this time.

Instead, in accordance with the request of the parties, the Court will proceed with separate trials for each Plaintiff on the question of damages.

**DONE AND ORDERED** in Jacksonville, Florida, this 7th day of September, 2016.

MARCIA MORALES HOWARD
United States District Judge

Copies to:

Counsel of Record